[L. A. No. 25304. In Bank. Aug. 12, 1960.]

JACQUELINE KUSIOR, Appellant, v. ALLAN JAY
SILVER, Respondent.

Ernest M. Miller and Edward L. Lascher for Appellant.

Cooper & Nelsen, Grant B. Cooper and Phyllis N. Cooper for Respondent.

DOOLING, J.—Plaintiff appeals from a judgment for defendant in an action to establish the paternity and to provide for the support of her child. Plaintiff's child was born July 29, 1954, nine days after the entry of a final decree of divorce dissolving her marriage to Thaddeus Kusior.

It appears from the settled statement that plaintiff and her husband separated in February, 1953, and that an interlocutory decree of divorce was secured in July, 1953. The child was probably conceived in October or November, 1953.

Both plaintiff and her husband testified that sexual relations between them ceased at the time of separation. However, Mr. Kusior exercised his right to visit their 8-year-old daughter at regular intervals. On these occasions, he would perform maintenance work on the property, and he took plaintiff and their daughter out to dinner on at least one occasion. Several times he remained in plaintiff's home until the early hours of the morning. Plaintiff testified: "I had to have someone to talk to. Yes, we sat and talked until 3 or 4 in the morning." Mr. Kusior continued these visits even after their daughter was sent east on a visit in May, 1954, but plaintiff had long since been pregnant at that time.

Two neighbors testified that Mr. Kusior was seen by them, sometimes in the evenings, during the period of possible conception. They were unable to say whether he stayed all night but did state that plaintiff and her husband did "not live together" after the separation.

Mrs. Nelson lived in the house as a roomer until some time in October. She testified that plaintiff did not live together with any man during that period, although she did see one man, not Mr. Kusior, both in the evening and the following morning. There were, however, as many as 10 men who visited plaintiff; they would sit with her in the den and sometimes bring groceries. Mrs. Nelson also saw one man leave amidst a commotion at 4 o'clock one morning.

Plaintiff testified that she first had intercourse with defendant early in June, 1953, and subsequently about four more times until she underwent an operation in September of that year. She testified that she had intercourse with defendant several times thereafter. He slept in the den the first time

he came to her house, about the middle of October, 1953, shortly after Mrs. Nelson moved out of the house. Mrs. Nelson testified that she never saw defendant until her appearance in court.

Plaintiff also testified that she went out with other men during the period of possible conception, and also frequented a certain cocktail bar. She stated, however, that defendant was the only man with whom she had intercourse.

Blood tests were taken of the parties pursuant to section 1980.3 of the Code of Civil Procedure. These tests established that plaintiff's husband could not have been the father of the child but that defendant was within the class of persons who could have been.

The sufficiency of the evidence to support a judgment for defendant is not disputed, but plaintiff contends that certain instructions involving the effect of the blood tests and the presumptions of legitimacy were in error, and could have caused the jury to dispose of the proceedings by improperly determining that Mr. Kusior must be considered to be the child's father.

The trial court gave instructions based on the following sections of our code, which set forth conclusive and rebuttable presumptions of legitimacy. Code of Civil Procedure, section 1962, subdivision 5, provides: ''Notwithstanding any other provision of law, the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.'' Section 1963, subdivision 31, sets forth as a disputable presumption: ''That a child born in lawful wedlock, there being no divorce from bed and board, is legitimate.'' Civil Code, section 193, provides: ''All children born in wedlock are presumed to be legitimate.'' Section 194 makes that presumption applicable to all children born within 10 months of the ''dissolution of the marriage.'' Section 195 provides that the only persons who can dispute that presumption are the state in an action for support under section 270 of the Penal Code, or the ''husband or wife, or the descendant of one or both of them.''

The instructions given to the jury based on these sections were to the effect that a conclusive presumption, which none of the other evidence in the case can contradict, would apply if there was a failure to show that there was not ''a reasonable possibility of access.'' The jury was also instructed that if they found that the conclusive presumption did not apply, then only the rebuttable presumption applies, and any evi-

dence, including the blood tests, might be considered to rebut it. The relevant instructions are set forth below.[1]

Appellant contends that the instructions defining the scope of the conclusive presumption were too broad in that ''co-

[1]''Now, you will observe there are two conditions which must exist and which you must find to exist before this conclusive presumption applies: 'The issue of a wife cohabiting with her husband, who is not impotent.'

''There is no question that Mrs. Kusior was married to Mr. Kusior, so she is a wife, but you must find that she cohabited with him during the period of conception involved in this case.

''You must also find that Mr. Kusior is not impotent. From the uncontradicted evidence in this case, you may accept as a fact that Mr. Kusior is not impotent; that is to say, he could father a child.

''So, then, the only question remaining for you to determine from the preliminary facts, is whether Mr. and Mrs. Kusior cohabited at any time and for any time during the period that conception must have taken place according to the laws of nature in this case.

''Hence, to invoke the conclusive presumption just read you, you need only find that Mr. and Mrs. Kusior cohabited, that is, at any time and for any time, lived together as husband and wife during the period when conception normally would have occurred in this case, or if you find from the evidence that Mr. Kusior, the husband, had access to his wife, Mrs. Kusior, during that period of conception involved here.

''There is evidence that the Kusiors had separated and had no sexual relations since or during the separation, but separation alone is not the test.

''To prevent this strong conclusive presumption from arising, where the child is conceived during marriage, which is the case here, the evidence must be clear and convincing that there in fact was no access; not simply that the parties were separated. If there was reasonable possibility of access, the conclusive presumption arises, and no evidence can be considered by you to contradict it.

''In that situation, the child is conclusively presumed to be legitimate and your verdict would have to be for the defendant, Dr. Silver.

''But, on the other hand, should you find that there was in fact no cohabitation by Mr. and Mrs. Kusior during the period in which conception normally would have occurred in this case, the conclusive presumption would not apply, but only the rebuttable presumption which was the one to the effect that a child born of a married woman within ten months after the dissolution of her marriage is presumed legitimate.'' (Court's Instruction ''A.'')

''You should bear in mind that if you find the fact of cohabitation existing between Mr. and Mrs. Kusior during the period of conception in this case the conclusive presumption applies and you may not consider any of the evidence in the case for the purpose of contradicting that presumption.

''But, if you find that it does not apply, and only the rebuttable presumption applies, then you may consider all the evidence in accordance with these instructions.'' (Court's Instruction ''B.'')

''There is another presumption which applies, depending as to whether you find certain preliminary facts to exist. That presumption says: 'The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.' That presumption cannot be contradicted, if it applies.'' (Court's Instruction ''C.'')

''The law throws certain protections around a family and the children of the family, for obvious reasons.

''There is a presumption established by law which says that all children of a woman who has been married, born within ten months of

habiting,'' as used in subdivision 5 of section 1962 of the Code of Civil Procedure, should properly be construed as ''the living together of a man and woman ostensibly as husband and wife'' (*Estate of Mills,* 137 Cal. 298, 301 [70 P. 91, 92 Am. St.Rep. 175] ) and that certain comparatively recent cases in the District Courts of Appeal which have, or appear to have, broadened the definition of ''cohabiting,'' as used in this section, to include ''a reasonable possibility of access'' constitute an unwarranted extension of the meaning of that section. We have concluded from an examination of the decisions of this court dealing with the proper construction of section 1962, subdivision 5, that the definition contended for by appellant is clearly the one originally adopted by this court, and that the cases in the District Courts of Appeal which have, or appear to have, broadened this definition find no support in any decision of our court.

*Estate of Mills, supra,* 137 Cal. 298, which is apparently the first decision on the scope and effect of section 1962, subdivision 5, stated clearly and with no uncertainty at page 301 : ''The word 'cohabiting,' as used in the above section, means the living together of a man and woman ostensibly as husband and wife. (1 Bishop on Marriage, Divorce, and Separation, § 1669, note 1.) ''

Respondent argues that this definition is not necessarily conclusive because in *Mills* the court was dealing with a case where the spouses were admittedly living together, and the

the dissolution of the marriage, are presumed to be legitimate children of that marriage.

''This presumption, which is rebuttable, applies in this instance.

''The child was born of a woman who had been married, born nine days after the dissolution of the marriage.

''As I say, the presumption is rebuttable, and you may apply, either in support of or contradiction of this presumption, any of the evidence that has been received in this case, including the two blood tests.'' (Court's Instruction ''F.'')

Pertaining to the results of the blood tests, the court instructed the jury as follows: ''The doctor's report of the results of the blood tests made of the parties to this action, and of the minor child Dorothy, does not establish that the defendant is the father of the minor child Dorothy. It merely establishes that the defendant is one of that group of men whose blood is such that, physiologically, any one of them could father a child having blood such as Dorothy, so that therefore it is physiologically possible for the defendant to be Dorothy's father. This report is to be considered by you, together with all of the other evidence presented in this case, in resolving the issue of whether the defendant is the father of the minor child Dorothy. The other report, you will recall, gave its interpretation of the findings that Thaddeus Kusior was excluded from the class of those who could be the father of the child.'' (Court's Instruction ''E.'')

court was not called upon to consider whether the word "cohabiting" might have a more extensive meaning.. However all doubt on this score was resolved by this court in its consideration of *Estate of Walker* on two successive appeals, 176 Cal. 402 [168 P. 689] and 180 Cal. 478 [181 P. 792]. In *Walker* the spouses were not living together but the opportunity for intercourse existed. The court did not consider section 1962, subdivision 5, applicable but held on both appeals that the case was governed by the disputable presumption of section 194 of the Civil Code. That this was no mere oversight is apparent from the following quotation from the second Walker opinion: "The English rule would seem to go so far as to permit evidence of nonintercourse even where the parties are cohabiting, i.e., *living together in the same house or apartments*. Such is not the rule in this state. (Code Civ. Proc., § 1962, subd. 5; *Estate of Mills,* 137 Cal. 298 [92 Am.St.Rep. 175, 70 P. 91.]) But with this statutory exception the true rule in America, as well as England, is, we believe, that if it is possible by the laws of nature for the husband to be the father (that is, if there was coition and no impotency), no inquiry will be permitted into the probabilities of the case one way or the other, but the presumption of legitimacy is conclusive;[2]

[2]Some of the confusion in the later cases may be due to the use of the language in this decision: "(that is, if there was coition and no impotency), no inquiry will be permitted into the probabilities of the case one way or the other, but the presumption of legitimacy is conclusive." A *reading of the entire opinion* makes it clear that the holding of the court was that the conclusive presumption created by section 1962, subdivision 5, only applies if the husband and wife were living together, and that the rebuttable presumption otherwise applicable may be overcome by proof of nonintercourse; but if the fact of intercourse is found by the court or jury, the rebuttable presumption is not overcome, i.e., in the language of the court, becomes "conclusive." See e.g., 180 Cal. 489, where the court, in discussing the Banbury Peerage case, says: "First, it was declared specifically that although the husband and wife might have had opportunities for access to each other, yet evidence was admissible to rebut any inference from this that they did in fact have it. Second, that the word 'access' is used in the sense of sexual intercourse. The importance of this second point lies in the fact that there has been confusion as to the meaning of the word in this connection. It has been assumed that it meant only 'access' in the sense that the husband saw or visited his wife, had 'access' to her presence. It is largely from this misunderstanding of the sense in which this particular word was used that the impression has arisen that when 'access' by the husband to the wife in the sense of their meeting so as to afford an opportunity for sexual intercourse is shown, the matter is concluded and proof that intercourse did not take place is not admissible."

The court then, at 180 Cal. 490-491, quoted from 3 Ruling Case Law 728: "There are authorities which take the position that the question . . . in a case of this character, is not whether the mother of the child and her husband did or did not have sexual intercourse . . . but whether

and, on the other hand, it is always permitted to show that it was not possible by the laws of nature for the husband to be the father, as by showing impotency on his part, *want of intercourse during the possible period of conception,* or that the child is of a race or color such that it could not have been conceived by the husband.'' (Emphasis added; 180 Cal. 491.)

Taken together, the Mills and Walker cases clearly limited the application of the conclusive presumption of section 1962, subdivision 5, to cases where the parties were ''living together . . . ostensibly as husband and wife'' (*Mills*) or ''living together in the same house or apartments'' (*Walker*) and in all other cases applied only the rebuttable presumptions. No later case in this court departing from this rule has been cited to us. *Nelson* v. *Nelson,* 7 Cal.2d 449 [60 P.2d 982], cited by respondent, is consistent with this rule, as the court there stated: ''There is evidence tending to show that on at least two occasions, the first apparently having been abortive, the parties had lived and cohabited together as husband and wife for a period of several days with the desire and intent of reconciling their differences. . . .'' (7 Cal.2d 452.)

Although a variety of meanings have been ascribed by various courts to the words ''cohabit'' and ''cohabitation'' (see e.g., 14 C.J.S. 1311-1312), their primary etymological meaning is living *with* or *together,* from the Latin ''co-'' (''co- signifies in general *with, together, in conjunction, jointly.* . . .'' Webster's New International Dictionary, 2d ed., unabr., p. 510) and ''*habitare,* to dwell, to have possession of (a place). . . .'' (*Id.,* p. 520, derivation of ''cohabit''). ''Cohabit'' is defined in the same work (p. 520) as: ''1. To dwell or abide in

the opportunity for sexual intercourse by any possibility presented itself to them. . . . The authorities which take these views are in the minority, the great weight of authority being to the effect that access, that is an opportunity for sexual intercourse, need not be shown to have been impossible, and that where an opportunity for sexual intercourse is shown, the presumption favoring legitimacy, while very strong, is not conclusive, and may be rebutted by showing that intercourse did not in fact take place.''

The court in second *Walker* adopted the majority view thus expressed in Ruling Case Law and stated at 180 Cal. 491-492: ''It should perhaps be noted that when it is said that the presumption of legitimacy is conclusive if it were possible by the laws of nature for the husband to be the father, it is not meant that the proof of the fact of such impossibility must itself be beyond possibility of doubt. . . . The presumption of legitimacy is strong and the proof of . . . nonintercourse must be clear and satisfactory, but this is all. The presumption does not operate to change the general rule that in civil cases the issue is to be determined upon the preponderance of evidence, but like other presumptions operates under and beneath that rule.''

company. *Archaic.* 2. To dwell or live together as husband and wife. In the United States at the common law, marriage is presumed when a man and woman have *cohabited* permanently together, being reputed by those who know them to be husband and wife, and admitting the relationship. . . .''

Our courts so defined the words in determining the statutory requirement of a "common-law (i.e., nonceremonial) marriage" under the former section 55 of the Civil Code, which required "a mutual assumption of marital rights, duties, or obligations." In *Kilburn* v. *Kilburn,* 89 Cal. 46, 50 [26 P. 636, 23 Am.St.Rep. 447], this court said : ". . . there is no assumption of marital rights, duties, or obligations, within the meaning of section 55 of the Civil Code, until the commencement of cohabitation by the parties to the agreement. And by cohabitation is not meant simply the gratification of the sexual passion, but 'to live or dwell together, to have the same habitation, so that where one lives and dwells there does the other live and dwell also.' '' (*Cf. Sharon* v. *Sharon,* 79 Cal. 633, 670 [22 P. 26, 131].) ▓▓▓ While the word "cohabit" might conceivably be used by the Legislature with different meanings in different connotations, section 16 of the Code of Civil Procedure provides that "technical words and phrases, and such others as have acquired a peculiar and appropriate meaning in law . . . are to be construed according to such peculiar and appropriate meaning or definition." It seems clear that the word "cohabit" had acquired such a peculiar and appropriate meaning in connection with the marriage relation itself, in the cognate field of the so-called "common-law marriage," and this court in *Estate of Mills, supra,* 137 Cal. at page 301, was but following the dictate of section 16 of the Code of Civil Procedure when it gave to the word "cohabiting" in section 1962, subdivision 5, the same peculiar and appropriate meaning.[3] Indeed the other provision of section 16 of the Code of

---

[3]It is significant that in *Mills,* 137 California at page 301, this court cited 1 Bishop on Marriage, Divorce, and Separation, section 1669, note 1, in support of its definition of "cohabiting," and that the first case cited by Bishop in this footnote is *Yardley's Estate,* 75 Pa. St. 207. In *Kilburn* v. *Kilburn,* 89 Cal. at page 50, in support of its definition of "cohabitation," the court cited and quoted from this same *Yardley's Estate.* An examination of *Yardley* shows that it dealt with proof of cohabitation as evidence of marriage.

A common use of the noun "cohabitation" is found in the statement of this rule of evidence relating to the proof of marriage. "The fact of cohabitation as man and wife, by itself, raises a presumption of a legal marriage; and this is particularly so after a long interval of time; thus such cohabitation must be continuous and consistent to sustain the presumption." (1 Wharton, Law of Evidence, 3d ed. (1888), § 84, pp. 84-

Civil Procedure that "[w]ords and phrases are construed according to the . . . approved usage of the language" would reach the same result since "cohabit," according to such usage, has the settled meaning of "dwell or live together as husband and wife." (Webster's New International Dictionary, *supra.*)

The definition of "cohabiting" adopted in the Mills case and confirmed in the second Walker case has been since accepted and followed by the District Courts of Appeal in the following cases: *Hilton* v. *Hilton,* 54 Cal.App. 142, 151 [201 P. 337]; *Mathews* v. *Hornbeck,* 80 Cal.App. 704, 708-709 [252 P. 667]; *Winsette* v. *Winsette,* 47 Cal.App.2d 308, 309 [117 P.2d 897]; *Vinders* v. *Lewis,* 93 Cal.App.2d 90, 92-93 [208 P.2d 687]; *McGillis* v. *Hofeditz,* 101 Cal.App.2d 760, 762 [226 P.2d 372]; *Daniels* v. *Daniels,* 156 Cal.App.2d 371, 373 [319 P.2d 662]; *Madden* v. *Madden,* 160 Cal.App.2d 422, 424 [325 P.2d 538].

Respondent relies particularly upon *Williams* v. *Moon,* 98 Cal.App.2d 214 [219 P.2d 902]; *People* v. *Kelly,* 77 Cal.App. 2d 23 [174 P.2d 342]; *People* v. *Hamilton,* 88 Cal.App.2d 398 [198 P.2d 907]; *Hill* v. *Johnson,* 102 Cal.App.2d 94 [226 P.2d 655]; *Parker* v. *Parker,* 107 Cal.App.2d 215 [236 P.2d 828]; *Estate of Marshall,* 120 Cal.App.2d 747 [262 P.2d 42]; *Estate*

---

85; *cf.* 2 Kent's Commentaries, 14th ed. (1896), p. 87, note (x)(b): "Cohabitation and repute are evidence of marriage"; 7 Wigmore on Evidence, 3d ed. (1940), § 2083, pp. 427-431, quoting (at p. 428) Lord Westbury in the Breadalbane Case (L.R. 1 Sc. App. 182): "Cohabitation as husband and wife is a manifestation of the parties having consented to contract the relationship 'inter se.' It is a holding forth to the world by the manner of daily life, by conduct, demeanor, and habit, that the man and woman who live together have agreed to take each other in marriage . . ."; 1 Jones on Evidence, 5th ed. (1958), § 16, p. 33, § 94, p. 165, § 95, pp. 166-167; 35 Am.Jur., Marriage §§ 220-221, pp. 326-330. See 32 Cal.Jur.2d, Marriage, § 34, pp. 364-367, collecting the California cases in the footnotes.)

This rule of evidence was already settled in California at the time of the original adoption of the codes in 1872. (*People* v. *Anderson* (1864), 26 Cal. 129, 130, 133-134.) The "cohabitation" referred to in this rule clearly meant "living together as husband and wife," not mere "sexual intercourse," and not mere "opportunity." See *Estate of Baldwin,* 162 Cal. 471, 488-491 [123 P. 267], where the court used the following language in stating this rule of evidence: ". . . where a man and a woman lived together as husband and wife . . . and by their conduct . . . thus established a common, uniform, and undivided repute that they were married, evidence of all this was accepted . . . as raising a presumption that a marriage had taken place." In *Baldwin* this court, at page 489, quoted with approval the same language of Lord Westbury in the Breadalbane Case (cited in Baldwin as *Campbell* v. *Campbell*) quoted supra from Wigmore, and concluded at page 490 with a quotation from *Hinckley* v. *Ayres,* 105 Cal. 357, 360 [38 P. 735]: "There is no such assumption unless the parties live together *as husband and wife.* . . ." (Emphasis in the opinion.)

*of Young,* 132 Cal.App.2d 25 [281 P.2d 368]; *Daniels* v. *Daniels, supra,* 156 Cal.App.2d 371; and *Bonsall* v. *Bonsall,* 169 Cal.App.2d 753 [337 P.2d 843].

It is noteworthy that the earliest of these cases, *People* v. *Kelly,* 77 Cal.App.2d 23 [174 P.2d 342], was decided in 1946. The author of this opinion was the author of the opinion in *Kelly* and must take his full share of the blame for the use of an unfortunate sentence in that case which has led, as is the habit of ill-considered language, to unforeseen consequences. In *Kelly* it was said: "The admission of appellant that he believed that he was not Richard's father although he could not prove that fact supports the inference that he had *conjugal access* to his wife within the period of the child's conception in which event his paternity would be conclusively presumed. (Code Civ. Proc., § 1962, subd. 5.)" (Emphasis added; 77 Cal.App.2d 26.) For the use of the expression, "conjugal access" to satisfy the requirement of Code of Civil Procedure, section 1962, subdivision 5, no authority was cited in *Kelly,* and we are satisfied that none could then have been found in this state.

Following the decision in *Kelly,* the case of *Williams* v. *Moon, supra,* 98 Cal.App.2d 214, came before the District Court of Appeal. In that case the court was unfortunately without the benefit of any brief for the respondent, and the case was decided on the appellant's opening brief. (98 Cal. App.2d 215.) In reversing, the court said at page 219: "It is thoroughly settled by these and other cases that if there was access to the wife by the husband during the period that conception normally would occur, the presumption, except in certain cases not here relevant, is conclusive." The court cited in support of this statement *People* v. *Kelly, supra,* 77 Cal.App.2d 23, 26; *Dazey* v. *Dazey,* 50 Cal.App.2d 15, 17 [122 P.2d 308]; and *People* v. *Hamilton, supra,* 88 Cal.App.2d 398, 400.

That *Kelly* was a feeble reed upon which to lean is clear from our discussion of that case. *Dazey* v. *Dazey, supra,* 50 Cal.App.2d 15, on its facts fell within the rule of *Estate of Mills, supra,* 137 Cal. 298, since the second husband against whom the conclusive presumption was held to apply was living with the mother from the date of their marriage. The crucial question was whether the birth of the child within 225 days of the second marriage was contrary to the usual operation of the laws of nature. (*Estate of McNamara,* 181 Cal. 82 [183 P. 552, 7 A.L.R. 313].) The court held that it was not, and

that under the circumstances, i.e., admitted cohabitation in the sense of living together, neither party could testify to nonaccess. (P. 17.) The court (50 Cal.App.2d 17-18) quoted certain language from first *Walker*, 176 Cal. 402, regarding opportunity for intercourse, which this court had explained in second *Walker*, 180 Cal. 478, as not controlling on the second appeal; the court in second *Walker* pointing out that ''access'' may be used in two senses, opportunity for intercourse and actual intercourse (see footnote 2), and adopting the latter meaning, after stating that in first *Walker* both views had been inconsistently adopted so that neither was the law of the case. (180 Cal. 484.)[4] We can find nothing in the facts or law in *Dazey* to lend support to the definition of cohabitation adopted in *Moon*.

In *People* v. *Hamilton, supra*, 88 Cal.App.2d 398, a prosecution for incest, the question arose whether the complaining witness was the defendant's daughter. The girl was born in May, 1931, to defendant's wife. There was evidence that defendant visited and lived with his wife in Oklahoma during the probable period of conception. Defendant denied having been in Oklahoma at that time. The court, in holding that if the jury believed the testimony of living together, the conclusive presumption would apply, said: ''It apparently is the defendant's contention that . . . by reason of his testimony that he did not see his wife from 1929 to 1943, and that he was absent during the time conception would have been necessary . . . therefore he has brought himself within the disputable presumption. . . . However, such testimony was directly contradicted by his mother-in-law who testified that he returned on several occasions to her home in Oklahoma, and in particular during the summer of 1930, where he and her daughter . . . cohabited together. The jury . . . believing the testimony of the mother-in-law . . . inferentially found that the defendant was not wholly absent during the essential period of conception,

[4]The quotation from first *Walker*, 176 Cal. 409, reads: ''It is, however, very difficult to conclude against the legitimacy in cases where there is no disability and where some society or communication is continued between husband and wife during the time in question, so as to have afforded opportunities for sexual intercourse; and in cases where such opportunities have occurred and in which any one of two or more men may have been the father, whatever probabilities may exist, no evidence can be admitted to show that any man other than the husband may have been or probably was the father of the wife's child.'' Any implication in first *Walker* that mere opportunity for sexual intercourse would preclude proof of the fact of nonintercourse was expressly repudiated in second *Walker*. See footnote 2.

and therefore the conclusive . . . presumption applies.'' (88 Cal.App.2d 400-401.)

The language "not wholly absent" obviously refers to appellant's testimony that "he was absent during the time of conception." It cannot reasonably support the conclusion that the court by this language was intending to enlarge the definition of "cohabiting," so long settled by our decisions.

We conclude that insofar as *Williams* v. *Moon, supra,* 98 Cal.App.2d 214, purported to enlarge the definition of "cohabiting" in section 1962, subdivision 5, to include "access" or "the reasonable possibility of access," that decision was not supported by any previous well-considered decision and departed from the correct rule established in *Estate of Mills, supra,* 137 Cal. 298, and *Estate of Walker, supra,* 180 Cal. 478. The other cases cited by respondent on this question are either not directly in point or they cite and rely on *Williams* v. *Moon, supra.* ▮▮▮▮ We conclude that "cohabiting" in section 1962, subdivision 5, should be construed to mean "living together as husband and wife," and any language giving or suggesting a broader meaning in any of the cases in the District Courts of Appeal (i.e., *People* v. *Kelly,* 77 Cal.App.2d 23 [174 P.2d 342] ; *Williams* v. *Moon,* 98 Cal.App.2d 214 [219 P.2d 902] ; *Hill* v. *Johnson,* 102 Cal.App.2d 94 [226 P.2d 655] ; *Estate of Marshall,* 120 Cal.App.2d 747 [262 P.2d 42] ; *Waters* v. *Spratt,* 166 Cal.App.2d 80 [332 P.2d 754] ; and *Bonsall* v. *Bonsall,* 169 Cal.App.2d 753 [337 P.2d 843] ) is to that extent disapproved.

▮▮▮▮ We conclude that the trial court committed error in instructing that the conclusive presumption applies if the husband had "access" or "reasonable possibility of access" to his wife during the period of conception.

Appellant also contends that the instructions with regard to the conclusive presumption should not have been given at all in view of the fact that the blood tests showed that her husband could not have been the father. She argues that the conclusive presumption is subject to well-recognized exceptions, and that blood tests should be added to the exceptions. She relies principally on the explanation for the exceptions set forth in *Estate of McNamara, supra,* 181 Cal. 82, 96 : "The reason why the conclusive presumption is not applied in such instances is that the element of indeterminability which is the reason for the presumption in the ordinary case is absent. . . . The actual fact, in other words, is capable of definite determination, and for this reason the conclusive presumption which

is a substitute for such determination is not properly applicable.''

Appellant cites the scientific reliability of blood-grouping tests (see concurring opinion of McComb, J., in *Berry* v. *Chaplin*, 74 Cal.App.2d 652, 667-668 [169 P.2d 442]), which was accorded recognition by the adoption of the Uniform Act on Blood Tests to Determine Paternity (Code Civ. Proc., §§ 1980.1-1980.7), and argues that the ''actual fact'' is here capable of definite determination, and thus under the reasoning in *Estate of McNamara, supra,* ''the conclusive presumption is not applicable.'' However, the actions of the Legislature have clearly established the effect of the blood-grouping tests in relation to the application of the conclusive presumption to be otherwise.

The judicial decisions prior to the adoption of the Uniform Act in 1953 have a direct bearing on the present problem. In *Arais* v. *Kalensnikoff*, 10 Cal.2d 428 [74 P.2d 1043, 115 A.L.R. 163], the defendant was adjudged the father despite blood tests to the contrary. We affirmed, stating at page 432: ''Whatever claims the medical profession may make for the test, in California 'no evidence is by law made conclusive or unanswerable unless so declared by this code.' (Code Civ. Proc., § 1978.)'' In *Berry* v. *Chaplin, supra,* the same reasoning was applied and the same result was reached. Neither case involved a mother who was married at the time of conception or birth. However, in *Hill* v. *Johnson, supra,* 102 Cal.App.2d 94, a wife who was living in the same house with her husband at all times, including the time of conception, birth, and even the time of trial, brought suit against a third party for support. Blood tests disclosed that the husband could not have been the father, and he testified that he was sick at the relevant time and hence did not have intercourse with his wife. ''From this plaintiff argues that Mr. Hill could not have been the father of the child and that defendant could have been. Evidence of the result of a blood test is to be considered with all other evidence in the case and is not conclusive. [Citation.] It was error to admit the evidence since it is contrary to the conclusive presumption of legitimacy.'' (102 Cal.App.2d 96.) The Hill case was decided in 1951, and the Legislature in 1953 enacted our version of the Uniform Act on Blood Tests to Determine Paternity, providing: ''In a civil action, in which paternity is a relevant fact, the court . . . may . . . order the mother, child and alleged father to submit to blood tests.'' (Code Civ. Proc., § 1980.3.) ''If the court finds that the conclusions of all the experts . . .

are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly.'' (Code Civ. Proc., § 1980.6.) However, the Legislature significantly refrained from adopting section 5 of the Uniform Act, which provides: ''The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, show that the husband is not the father of the child.'' Our law emerged without this section or any reference to the subject matter contained therein.

Statutes are to be interpreted by assuming that the Legislature was aware of the existing judicial decisions. (See 45 Cal.Jur.2d 615, 616.) Moreover, failure to make changes in a given statute in a particular respect when the subject is before the Legislature, and changes are made in other respects, is indicative of an intention to leave the law unchanged in that respect. (*Cole* v. *Rush,* 45 Cal.2d 345, 355 [289 P.2d 450, 54 A.L.R.2d 1137].) That rule can be applied by analogy where a section is omitted in the face of our decisional law. Thus, it is clear that the Uniform Act negatives the possibility of another *Arais* v. *Kalensnikoff, supra,* or *Berry* v. *Chaplin, supra,* neither of which involved a married mother. But it is apparent that the failure of the Legislature to enact that part of the act which would specifically have enabled the result of a blood test to overcome the conclusive presumption declared in section 1962, subdivision 5, must be deemed an intention not to change the rule stated in *Hill* v. *Johnson, supra.*

Moreover, section 1962, subdivision 5, was amended in 1955 by the addition of the emphasized words: ''*Notwithstanding any other provision of law,* the issue of a wife cohabitating with her husband, who is not impotent, is indisputably presumed to be legitimate.'' This addition was part of an act which gave the state power to dispute the rebuttable presumption by adding the state to the parties enumerated in Civil Code, section 195, and also by adding a provision to Penal Code, section 270, to the effect that the state could prove nonaccess ''or any other fact establishing nonpaternity of a husband.'' Since the people have been equated with all others who may rebut presumptions, it is apparent that they and all others were not meant to be able to use this section, or any other provision of law, as against section 1962, subdivision 5. It is further apparent that blood tests are one of the ways in which paternity could be disputed other than noninter-

course, and that the overall legislative intent manifestly precludes any other construction of the statutes.

Appellant contends that such a construction is not consistent with constitutional principles in that there is no reasonable relationship between the presumption and the fact sought to be presumed in a case in which there is scientific evidence to the contrary. (*Kirchhubel* v. *Munro,* 149 Cal.App. 2d 243, 249 [308 P.2d 432].) However, appellant does not suggest that the Legislature has no interest in or power to determine, as a matter of overriding social policy, that given a certain relationship between the husband and wife, the husband is to be held responsible for the child. There are significant reasons why the integrity of the family when husband and wife are living together as such should not be impugned. A conclusive presumption is in actuality a substantive rule of law and cannot be said to be unconstitutional unless it transcends such a power of the Legislature. (Morgan, *Federal Constitutional Limitations Upon Presumptions Created by State Legislation,* Harvard Legal Essays (1934) 323, 328.)

Appellant's final contention is that the trial court was in error in instructing the jury that the blood tests were not conclusive as against the rebuttable presumption but were only evidence to be weighed with all the other evidence. A similar argument was rejected in *McKee* v. *McKee,* 156 Cal.App.2d 764 [320 P.2d 510], a case in which the conclusive presumption was inapplicable, but the judgment was affirmed on the basis of the rebuttable presumption despite a blood test which negatived paternity. "It has not been determined whether paternity is a relevant fact in a case like the instant one where the child's mother is married at the time of conception and the husband denies paternity or whether the statute is limited to filiation proceedings where the child's mother is unwed. As the version of the statute adopted by our Legislature specifically excluded that portion of the act which provided that [the presumption of legitimacy is overcome by blood tests], defendant's argument would appear to be without merit." (156 Cal.App.2d 766-767.) However, disputable presumptions are evidentiary devices which can be overcome by clear and convincing evidence. Although a rebuttable presumption is treated by our court as evidence which may outweigh positive evidence against it, there has been a legislative determination here that blood test evidence is conclusive. (Code Civ. Proc., § 1980.6.) Unless there can be found a manifested

intent that this section specifically dealing with the effect of blood tests does not define the effect of such blood tests in every case in which they are admissible into evidence, then it seems clear that since they have always been admissible for whatever their worth as evidence capable of overcoming a rebuttable presumption (*McKee* v. *McKee, supra,* even assumes that they are), they ought, in view of the overall recognition by the statute of their accuracy, to be conclusive against a merely rebuttable presumption. ▆▆ Statutes are to be interpreted to give a reasonable result consistent with legislative purpose (45 Cal.Jur.2d 625-626), and it cannot be said that such a result is not the most reasonable, nor can it be said that legislative 'purpose demands a contrary result. ▆▆ The fact that section 5 of the Uniform Act was omitted can be explained by assuming that the Legislature did not intend to affect the conclusive presumption, but that the statute as enacted was to have whatever effect on the rebuttable presumption a reasonable interpretation thereof would give it. If we did not have the dual system of presumptions, then we might be forced to give a greater weight to the omission, but in the face of the dual system, we need not do so.

▆▆ We conclude that the result of blood tests taken under the Uniform Act (Code Civ. Proc., § 1980.1 et seq.) may not be used to controvert the conclusive presumption of paternity created by subdivision 5 of section 1962 of the Code of Civil Procedure, but that under the language of section 1980.6, if "the conclusions of all the experts . . . are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly,"[5] where the tests so taken establish that the mother's husband could not be the father of. the child the rebuttable presumptions of paternity are conclusively-rebutted. The dictum in *McKee* v. *McKee,*

---

[5]There appears to have been only one test made in this case of the blood of the husband. Since section 1980.6 speaks of "the conclusions of all the experts," it would seem that more than one expert must make the tests and agree upon the results to require that "the question of paternity shall be resolved accordingly." (*State* v. *Sargent,* 100 N.H. 29 [118 A.2d 596, 597].) While referring to this fact in his answer to the petition for hearing before this court, respondent concedes that this does not affect the legal questions posed. "Though not affecting the legal points involved in this appeal, it is perhaps of passing interest that . . . there was but one test. . . ." (Answer to Petition for Hearing, p. 11.) Since more than one expert may readily be appointed to examine the blood of the husband, the mother, and the child on a new trial, we have deemed it proper to consider the points raised as to the construction which should be given to the Uniform Act in relation to the presumption of legitimacy.

*supra*, 156 Cal.App.2d 764, inconsistent with this conclusion, is disapproved.

The jury after deliberating returned to court and asked to be reinstructed on the effect of the presumptions of legitimacy. After being so instructed, they returned shortly with their verdict. Under the circumstances the prejudice from the error in defining ''cohabiting'' seems clear.

The judgment is reversed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and White, J., concurred.